## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**JEFFREY PIERCE,**

**Defendant.**

**CR-18-30024-MGM**

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO WITHDRAW PART OF HIS GUILTY PLEA

The United States of America, by and through Andrew E. Lelling, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney (the "Government"), respectfully submits that the defendant's motion to withdraw part of his guilty plea (the "Motion" and D.27) should be denied because: (1) it seeks relief that cannot practically be granted; and (2) all of the factors considered by the First Circuit weigh against him.

First, the Court should deny the motion because it seeks relief that cannot be granted. The defendant must choose between withdrawing his plea entirely or proceeding to sentencing as charged and pled.

Further, the defendant has failed to satisfy the First Circuit's standards for plea withdrawal. Most importantly, the defense does not dispute that the district court ensured at the defendant's Rule 11 hearing that the defendant's plea was voluntary, intelligent, and knowing, pursuant to a explicit plea agreement, and that the plea was amply supported by the facts, which were agreed to by the defendant. Second, the defendant's claim that he "has come to understand that he did not possess the intent to defraud at the time he engaged in conduct that resulted in a fraud," Motion at 1, is implausible, inconsistent with the undisputed facts, based upon no new evidence, and

supported only by the affirmation of his attorney.   Third, the defendant's motion is highly ill-timed, since it was filed more than nine months after his guilty plea and only after his sentencing hearing was continued at the court's initiative.   Fourth, his assertion of legal innocence is unsupported, baseless, and inconsistent with his attorney's own representations at the sentencing. Even if the court were to find that these factors weighed in the defendant's favor, permitting him to withdraw his plea now would prejudice the Government.

1.     <u>Factual and Procedural Background</u>

a.     <u>The Defendant's Guilty Plea</u>

On June 27, 2018, the defendant pleaded guilty, pursuant to a written Plea Agreement (D.6), to a highly detailed Information that charged him with one count of conspiracy in violation of 18 U.S.C. § 371.   (D.2).   This count charged him with conspiring to commit two substantive offenses: (1) receipt of money through transactions of a credit union with intent to defraud in violation of 18 U.S.C. § 1006; and (2) false statements to a federal credit union in violation of 18 U.S.C. § 1014.  *Id.*, ¶ 15.

In addition to the details set forth in the ten-page Information, the defendant's Plea Agreement contained an agreed-upon, four-page Statement of Facts.   The defendant agreed that:

        i.     He and several of his construction and real estate development companies had numerous loan accounts at Greylock Federal Credit Union ("GFCU"), which were supervised by his co-conspirator, a GFCU loan officer named Michael Dicenzo ("Dicenzo").

        ii.     Between March 1, 2005 and September 5, 2008, Dicenzo authorized approximately $4 million in various loans and loan modifications to Pierce and his companies in knowing and intentional violation of GFCU's loan

approval, loan aggregation, loan modification, and loan documentation policies. By circumventing GFCU's policies, Dicenzo caused GFCU to provide Pierce and his companies with funds far in excess of what Pierce and his companies could reasonably receive or repay.

iii.　　In exchange for improperly authorizing these loans, Pierce agreed to provide and did provide Dicenzo various money, profit, property, and benefits that derived from the GFCU loan funds. After GFCU auditors discovered the loan improprieties, Dicenzo and Pierce agreed to provide, and did provide, a false cover story for some of the payments.

iv.　　Pierce provided Dicenzo with the following: $134,773 in check payments from Pierce's companies that derived from GFCU loan funds and that were paid to a front company created by Dicenzo called CAD Home Designs ("CAD"); the free use of a home constructed by one of Pierce's companies with a GFCU loan; and the free use of a BMW automobile purchased by one of Pierce's companies with a GFCU loan.

v.　　The payments from Pierce's entities deposited in the CAD account included the following representative checks written by Pierce:

(1)　　On or about May 30, 2007, at Dicenzo's request, Pierce wrote two $7,500 checks to CAD that related to loan funds previously issued by GFCU to Pierce's companies.

(2)　　On or about September 17, 2007, at Dicenzo's request, Pierce wrote two $15,000 checks to CAD that related to other loan funds previously issued by GFCU to Pierce's companies.

3

vi.     In or about March 2010, Pierce met with an officer of GFCU and a representative of GFCU's forensic accounting firm to discuss the loans authorized by Dicenzo and still owed by Pierce and his companies.   At Dicenzo's direction and for the purpose of influencing the action of GFCU upon the loans, Pierce falsely stated that the monies paid by his companies to CAD were payments for design work that Dicenzo's wife provided to Pierce's construction projects, when in fact as Pierce knew, Dicenzo's wife did not provide any work to Pierce of his companies.

vii.     GFCU recovered only approximately $545,000 in collateral from Pierce.   GFCU's insurer, Fidelity and Deposit Company of Maryland, reimbursed GFCU $2,901,833, and GFCU lost an additional $877,725.

On June 27, 2018, the district court conducted a Rule 11 hearing, in which the defendant pleaded guilty.   (Electronic Clerk's Notes D.4, Transcript D.28).   The court first conducted a lengthy colloquy concerning the defendant's waiver of his right to indictment.   The defendant informed the court that he had completed one semester in college and had been self-employed for the past nineteen years as a general contractor, employing approximately nine people.   The court confirmed that the defendant was not under the care of a physician, psychologist, or psychiatrist for any mental or emotional health issues, and that the defendant was not under the influence of any medication, alcohol, or drug.   The defendant acknowledged that he had read the Information to himself and with his attorney, had no questions concerning his charges, had discussed all aspects of these charges with his attorney, and wanted to waive his right to indictment.   The defendant executed his waiver in open court, and the court observed that the defendant "seems to have a good working relationship with his attorney.   He certainly impresses me as someone who understands

what's going on here today.   He doesn't seem to be confused at all."   The court thus accepted the defendant's waiver as knowing and voluntary.   *Id.*, at 4-12.

The court then turned to the defendant's guilty plea.   The defendant acknowledged that his attorney, Lori Levinson ("Attorney Levinson"), had represented him for approximately two years, he was satisfied with her representation, he believed she was acting in his best interest, and he had completely reviewed the Information with her.   The defendant also admitted that he had reviewed the plea agreement with Attorney Levinson – every page, every paragraph, and every provision – and that he understood the entire document.   He acknowledged that he wanted to enter into the plea agreement, no one had forced or threatened him to enter into the plea agreement, no one promised or suggested a particular sentence if he entered into the plea agreement, and he was entering into the plea agreement because it was his free act after thinking about his options.   He agreed that he could not withdraw his plea if the court imposed an unexpected sentence.   He understood his waiver of appellate and collateral challenge rights and the collateral consequences of his plea, the applicable penalties, and the sentencing options.   *Id.*, at 11-21.   The defendant signed the plea agreement in open court.   *Id.*, at 23.   The defendant also stated he understood that he had a right to plead not guilty and proceed to trial, with all of the attendant trial rights, and that his guilty plea relinquished all of those rights.   *Id.*, at 25-28.

The court then explicitly informed the defendant that if he did plead guilty, his plea would be final:

> THE COURT:   And when you give up those rights, all those rights that I've just told you about, those rights are gone forever.   **So if a year down the road or five years down the road you reconsider or rethink this and want to go back and challenge the case because you think you didn't make a good decision today, you will not be able to.   These rights are gone forever.   Do you understand?**
>
> THE DEFENDANT:   I do.

5

*Id.*, at 28 (emphasis added).

The court then confirmed that the defendant had reviewed the Statement Of Facts, gone over it with Attorney Levinson in its entirety, and agreed to every fact, except for a newly raised disagreement about the loss amount. *Id.*, at 28 - 30.   The prosecutor informed the Court that the defendant had agreed to repay the credit union and had agreed to a forfeiture money judgement in the amount of $3.8 million. *Id.*, at 30-32.   The prosecutor then summarized the Statement of Facts, stating that: (1) the defendant knew that he was not entitled to receive the approximately $4 million in loans that Dicenzo authorized; (2) in exchange for improperly authorizing the loans, the defendant agreed to provide, and did provide, money, profit and benefits that derived from the loans themselves, as specified in the Information; (3) the defendant and Dicenzo advanced the conspiracy through the overt acts specified in the conspiracy count, including Dicenzo's authorization of a particular loan, Pierce's writing of a check to CAD with the proceeds of that loan, and Dicenzo's depositing of that check into an account; and (4) the defendant and Dicenzo agreed to provide, and did provide, a cover story to the credit union about the CAD payments when the credit union discovered the loan improprieties. *Id.*, at 32-34.

In response to repeated questioning from the court, the defendant assured the court that he agreed with the prosecutor's recitation of the facts, he had gone over every single page of the Statement of Facts, he committed the acts in the way that was described in the Statement of Facts and he agreed with everything in the Statement of Facts (with the exception of the dispute about the loss amount). *Id.*, at 35.

The court again cautioned the defendant that once the plea colloquy becomes complete, "as I've told you, there's no turning back."   The defendant requested the opportunity to pose a question to Attorney Levinson, and the court replied, "You can ask her as many questions as you'd

like."   Following their private discussion, the defendant acknowledged that he had resolved all of the questions that he wanted to ask Attorney Levinson and affirmed that he wanted to go forward with his change of plea.   Attorney Levinson informed the court that there was nothing that could compromise the defendant's judgement, she believed he understood the charges and his rights, and had no concerns regarding the court's acceptance of his guilty plea.   *Id.*, at 35-37.

        b.    <u>The Defendant's Pre-Sentence Report</u>

On September 6, 2018, the Probation Department provided the parties with its Pre-Sentence Report (the "PSR").   The PSR and Paragraphs 8 to 15 restated the facts set forth in the Plea Agreement's Statement of Facts, which was attached to the PSR.   PSR, ¶ 8 - 15.   Among other things, the PSR stated:

      i.    Between March 1, 2005 and September 5, 2008, Dicenzo authorized approximately $4 million in various loans and loan modifications to Pierce and his companies in knowing and intentional violation of GFCU's loan approval, loan aggregation, loan modification, and loan documentation policies.   PSR, ¶ 10.

      ii.    In exchange for improperly authorizing these loans, Pierce agreed to provide and did provide Dicenzo various money, profit, property, and benefits that derived from the GFCU loan funds. After GFCU auditors discovered the loan improprieties, Dicenzo and Pierce agreed to provide, and did provide, a false cover story for the CAD payments.   PSR, ¶ 12.

      iii.    Pierce provided Dicenzo with the following: $134,773 in check payments from Pierce's companies that derived from GFCU loan funds and that were paid to CAD; the free use of a home constructed by one of Pierce's

companies with a GFCU loan; and the free use of a BMW automobile purchased by one of Pierce's companies with a GFCU loan.   PSR, ¶ 13.

The defendant did not file any objections to the PSR.

        c.     The Defendant's Sentencing Memorandum

On March 22, 2019, the defense submitted a sentencing memorandum in support of a sentence of probation.  (D.20).  The defendant wholly acknowledged his guilt, agreeing that "the facts underlying the crimes[1] herein are set forth in detail in the PSR at paragraph 8 – 15."  *Id.*, at 2.  The defendant plainly conceded his guilt:   "**Pierce does not dispute the factual basis for his plea of guilty . . . and admits to having engaged in fraudulent conduct in obtaining loans from Greylock Federal Credit Union ("GFCU")**.  Likewise, . . . Pierce acknowledges and accepts responsibility for lying, at the direction of Michael Dicenzo . . . to GFCU investigators about payments he made at Dicenzo's request to a company named CAD . . . ."  *Id.* (emphasis added).

The defendant urged the court to impose a sentence of probation based upon various factors, including most importantly his role in the offense and the nature of his relationship with Dicenzo.  *Id.*, at 3.  The defendant argued that he was financially unsophisticated, naïve, and unknowledgeable about finances.  *Id.*  The defendant contended that he initially relied on Dicenzo's advice about obtaining and modifying loans, never questioned Dicenzo's authority to authorize all transactions, and "[b]y the time it dawned on Pierce that he really was unable to keep up with the loans and modifications approved by Dicenzo, he was financially in too deep to change course."  *Id.*, at 4.  The defendant relied upon his own admissions to investigating agents, in which he characterized his payments to Dicenzo as both personal loans ($90,000) or monies that

---

      [1] The defense sentencing memo mistakenly referenced a six-count Information, which was the basis for an earlier plea offer.

Dicenzo simply took ($134,773). *Id.*, at 4-5. The defendant argued that "**while Pierce was clearly naïve and didn't understand the unlawfulness of the loans and modifications authorized by Dicenzo early on in the relationship, it would be fair to say that as his financial situation began to unravel, he turned a blind eye to what Dicenzo had been doing.**" *Id.*, at 6 (emphasis added).

In requesting a sentence of probation, the defendant sought to contrast his role with Dicenzo's: "Pierce was a victim of Dicenzo's abuse of his position of trust, not only by authorizing loans and modifications knowing that Pierce could never keep up with the payments, but also by advising him to lie to bank investigators, by requesting loans and benefits from Pierce knowing that the only means Pierce had of providing the loans and benefits was with the proceeds of fraudulently obtained loans, and finally, by stealing from him." *Id.*, at 7.

      d.    <u>The Defendant's Sentencing Hearing</u>.

On April 5, 2019, the defendant appeared for his sentencing hearing. (Electronic Clerk's Notes D.25, Transcript D.30). Attorney Levinson confirmed that she had reviewed the PSR with the defendant, resolved any questions he had about it, and felt that he understood it. D.30, at 2. The defendant similarly affirmed that he had read the PSR, reviewed with Attorney Levinson the entire PSR, including specifically the section that described the facts of the case, and had no questions about it. *Id.*, at 3. Attorney Levinson also acknowledged that she had not filed any objections to the PSR. *Id.*

The court then observed that the some, but not all, of the letters submitted by the defense from friends and family members had a theme that the defendant did nothing wrong and did not violate the law, and that the defendant's sentencing memo had "subtle little hints at that theme as well." *Id.* at 10. The court then stated: "So I'll start with the question of why Mr. Pierce pled

9

guilty.   Is he guilty?   If he is, why is your sentencing memorandum suggesting he might not be?"

Attorney Levinson responded:

> [T]here are a lot of reasons why someone might plead guilty,
> particularly to federal charge, which is terrifying, particularly to a
> person as simple and unsophisticated as Jeff Pierce.   I can also tell
> you that although at the time he was in bed with Mr. Dicenzo, he
> wasn't realizing really what he was doing.   He wasn't realizing the
> illegality of what he was doing.   He also felt and feels to this day
> guilty.

*Id.,* at 10.   Attorney Levinson told the court that the prosecutor had presented her and the

defendant with a very compelling case, the Government had agreed not to bring other charges, the

plea "was a kind of compromise, and "basically Mr. Pierce pled guilty because he feels guilty and

it was pointed out to him."   *Id.*, at 10-11.

The court then stated, "I know that I say to every defendant, "Are you pleading guilty in

this case because you actually are guilty or for some other reason?   He didn't tell me anything

about him pleading guilty for some other reason, and he accepted the facts that were in the plea

agreement."   Attorney Levinson replied, **"Well, because the facts in the plea agreement are**

**factually correct.   He did do what they say he did."**   *Id.*, at 11 (emphasis added).

The court stated that "the change of plea was completely different in character, tone, and

nature than is this sentencing hearing," and Attorney Levinson replied, **"He wanted to plead**

**guilty, your Honor.   He believed then at the change of plea that he entered into an**

**agreement with Mr. Dicenzo to accept these loans**."   *Id.*, at 12 (emphasis added).

The court noted that the defense had discussed a *nolo contendere* plea and stated that

Attorney Levinson was essentially asking him to sentence an innocent man.   *Id.*   Attorney

Levinson and the Court then engaged in the following exchange:

> ATTORNEY LEVINSON:   Mr. Pierce wanted to plead guilty, as I
> said, because he felt that he was guilty.   He went along with Mike

> Dicenzo.   Mike Dicenzo presented these loans and modifications to
> him.   **He didn't think he had the ability to repay** --
>
> THE COURT:   Well, you know just as well as I do, we're all
> students of the criminal law here, and feelings of guilt do not equate
> to actual guilt.
>
> MS. LEVINSON:   **But he chose to plead guilty, to give up his
> right to a trial.   That is what he wanted to do.**   I respected that,
> your Honor, with hesitation and trepidation because I have met with
> Mr. Pierce, and I knew his quote/unquote side of the story.   Then
> we have that very compelling meeting with the Government, and
> [the prosecutor] did present a compelling case for the Government.

*Id.*, at 13 (emphasis added).

The court stated that the defendant's sentencing memorandum was concerning, and engaged in the following colloquy with the Attorney Levinson:

> ATTORNEY LEVINSON:   Well, I struggled mightily with that
> memorandum because I know that **Mr. Pierce is planning on
> standing up before your Honor today and accepting full
> responsibility for his actions, and he knows that what he did was
> wrong, and he pled guilty because he knows** --
>
> THE COURT: But your sentencing memorandum essentially tells
> me he didn't know what he did at the time he was doing it, didn't
> even realize it.
>
> MS. LEVINSON: I can't argue with that.

*Id.*, at 14 (emphasis added).

The Court later engaged in the following conversation with the defendant:

> THE COURT:   Why did you plead guilty?
>
> THE DEFENDANT:   **The reason I plead guilty, your Honor,
> was when it was explained, when [the prosecutor] explained it,**

11

**that I got loans I shouldn't have, that's true.   I guess I got loans I shouldn't have.   It didn't feel like I shouldn't have gotten them in the beginning, but after ten years or nine years, I understood now that the way they were done was wrong, and that's why I pled guilty**.   He talked about also how the presidency had changed, and the Guidelines would change, and if I went in front of a jury of my peers, that the agreement that he had drawn up several years prior when I had a different attorney, which I didn't personally think served me well, then I hired Lori, I didn't understand all of that.   But the way it felt to me was that when I got the loans, they didn't feel at that time that they were illegally done, but now I understand that they were.

THE COURT: **At the time you got the loans, did you have an agreement with Mr. Dicenzo to get the loans in an inappropriate way, to benefit you and he**?

THE DEFENDANT: **No, in the beginning we were** -- it was the –

*Id.* at 16-17.

The prosecutor then objected to the manner of this procedure, and asserted that "Mr. Pierce pled guilty pursuant to a fully counselled plea colloquy where all of the facts were known, where defenses were discussed between the defense and the prosecutor, where the evidence was plain to Mr. Pierce and his lawyer."   *Id.*, at 17-18.   The prosecutor and the court then engaged in further discussion, in which the prosecutor confirmed that the defendant had pleaded guilty to two underlying crimes, defrauding a credit union and making false statements to a credit union.   *Id.*, at 21-26.   The prosecutor informed the court that the defendant agreed to obtain a loan from the credit union and to pay the loan officer with the proceeds of the loan, the defense was now arguing that the defense did not know that the loans were improperly authorized, but "what Mr. Pierce did do knowingly is he got the money for the loan for one of his businesses, and then instead of using that loan to pay his business, he used proceeds of that loan to pay Mr. Dicenzo.   He essentially paid Mr. Dicenzo a kickback . . . ."   *Id.,* at 26.

After hearing from the prosecutor, the court then asked Attorney Levinson to explain why

she permitted the defendant to plead guilty, particularly to that part of the conspiracy to violate the credit union fraud statute, and Attorney Levinson replied: "**I let him plead guilty because he stated to me that he was guilty**. I don't -- yes, I think that the correct answer to your Honor's question during the plea colloquy, because you are guilty or for some other reason, I think it would have been more accurate to say because I am guilty **and** for other reasons." *Id.*, at 27-28 (emphasis added).

The court stated that it would be sentencing the defendant for a conspiracy to violate both the credit union fraud statute and the false statement statute and again asked, "do you want to say anything about disputing his guilt" on the conspiracy to violate the credit union fraud statute. The following colloquy ensured:

> MS. LEVINSON: I think that the part of the fraud on the bank charge that most compelled Mr. Pierce to believe that he was guilty at the time is that **he did know he was obtaining construction loans and business loans and the like, and he did know that he was using the proceeds of one loan, of a construction loan, to pay the interest on another loan. He knew that that was wrong. He also knew it was wrong to use the proceeds of the construction loan to loan Mr. Dicenzo $30,000 for his daughter's wedding. Clearly at the time he knew that those things were wrong.** What he didn't know at the time was –
>
> THE COURT: Knowing that they're wrong doesn't mean that it's part of an agreement to defraud the bank willfully.
>
> MR. BRESLOW: Your Honor --
>
> THE COURT: Attorney Breslow, please. Thank you.
>
> MS. LEVINSON: You're right, your Honor. **I truly don't believe he intended to defraud the bank. I believe he did defraud the bank**.

*Id.*, at 29-30 (emphasis added).

The court then offered to provide Attorney Levinson with an opportunity to speak with the

defendant. *Id.*, at 29. After a brief recess, Attorney Levinson informed the court that the defendant was prepared to proceed on that part of the conspiracy charge that involved the false statement to the credit union, and requested that the court convert his guilty plea to that part of the conspiracy charge that involved the credit fraud to "an *Alford* plea,[2] which would allow us to go forward with sentencing today." *Id.*, at 31. The court declined, and directed Attorney Levinson to file any motions "requesting anything you would like to request." *Id.*, at 34.

### e.   The Defendant's Motion

On April 11, 2017, the defense filed the instant Motion, along with an Affirmation from Attorney Levinson (D.27-1) and a legal memorandum (D.27-2). The defense did not file any affidavit from the defendant himself.

Attorney Levinson's Affirmation stated that the defendant had retained her in approximately June 2016, following plea discussions with prior counsel. (D.27-1, ¶¶ 3-4). Prior counsel provided Attorney Levinson with "voluminous discovery the government had provided to her." *Id.*, ¶ 5. In a "reverse proffer" session, the Government "produced a compelling produced a compelling presentation outlining the evidence they possessed; both Pierce and I believed that the evidence outlined could be sufficient to obtain a guilty verdict, notwithstanding Pierce's claim of innocence." *Id.*, ¶ 7. During the fairly lengthy period of time between this meeting and the defendant's Rule 11 hearing, she met with the defendant on several occasions to discuss the evidence, potential defenses and the choices he would have to make. *Id.*, ¶ 9. "Notwithstanding

---

[2] An *Alford* plea occurs when a defendant enters a guilty plea without admitting guilt. *See United States v. Bierd*, 217 F.3d 15, 17 n. 1 (1st Cir. 2000). In *North Carolina v. Alford*, 400 U.S. 25 (1970), the Supreme Court approved such a plea and held that "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.* at 37.

his understanding of the availability of a defense to the fraud charge, Pierce opted to avoid the possibility of conviction after trial, and chose to enter a plea of guilty to the information prepared by the Government." *Id.*, ¶ 10. During her preparation for sentencing, Attorney Levinson became increasingly convinced of the defendant's innocence, although the defendant "continued with his desire to move forward with sentencing on his guilty plea." *Id.*, ¶ 12. "After the hearing on April 5, 2019 before this Court, and in light of Pierce's statement to this Court that he did not intend to defraud the bank at the time he was accepting loans and modifications, Pierce, his wife and I had extensive conversations, and Pierce has decided that he wishes to withdraw his plea of guilty to so much of the information as alleges a conspiracy to defraud GFCU." *Id.*, ¶ 13.

In its memorandum, the defense conceded that his plea was voluntary, intelligent, and knowing: "Pierce does not assert that his plea was not voluntary, intelligent and knowing. At the time he entered his plea and was subject to the Court's colloquy in support thereof, he believed he would be found guilty if he proceeded to trial, and wanted to avail himself of the benefits of accepting responsibility and of foregoing the emotional and financial costs of a trial. (D.27-2, at 4). Moreover, the defense concedes that "that at the time of the guilty plea, Pierce did so because he *believed* he was in fact guilty." *Id.*, at 2.

Instead, the defense contended that "there is now a serious claim of innocence," based apparently on the defendant's statements to the Court at the Rule 11 hearing, but does not ground this claim on any newly discovered evidence or legal basis. *Id.*, at 3.[3]

2.    The Motion Should Be Denied Because It Seeks Impractical Relief

After years of plea discussions, the Government entered into a carefully negotiated Plea

---

[3] The defense memo references an investigative report prepared for GFCU and a report of the defendant's interview by federal agents, but each were provided to the defense long before his Rule 11 hearing.

Agreement with the defense that alleged a single conspiracy count to violate two distinct statutes: Section 1006 and Section 1014. The defendant now seeks to preserve its guilty plea to the conspiracy to violate Section 1014, but withdraw that part of the plea that concerns the conspiracy to violate Section 1006. In so doing, the defense seeks to retain the benefits of its plea bargain while avoiding the responsibility for the gravamen of the offense. The Plea Agreement, including its Guidelines, restitution, and forfeiture provisions, cannot withstand such a division. The defendant must opt to withdraw his plea entirely or proceed as he had been charged and pled.

       3.      <u>The Motion Should Be Denied Because It Fails To Meet First Circuit Standards</u>

           a.      <u>Principles Of Law</u>

"It is common ground that a defendant has no absolute right to withdraw a guilty plea." *United States v. Caramadre*, 807 F.3d 359, 366 (1st Cir. 2015) (citing *United States v. Ramos– Mejía,* 721 F.3d 12, 14 (1st Cir. 2013)). "When a defendant moves to withdraw a guilty plea after the court has accepted it but before the court has sentenced him, he may do so only if he 'can show a fair and just reason for requesting the withdrawal.'" *Id.* (quoting Fed. R. Crim. Pro. 11(d)(2)(B)) and citing *United States v. Gates*, 709 F.3d 58, 69 (1st Cir. 2013); *United States v. Marrero–Rivera*, 124 F.3d 342, 347 (1st Cir. 1997)). "The words 'fair and just reason,' however, must mean something more than that a defendant has had second thoughts about his plight." *United States v. Merritt*, 755 F.3d 6, 11 (1st Cir. 2014).

      "The burden rests with the defendant to make this showing." *Caramadre*, 807 F.3d at 366 (citing *Marrero-Rivera*, 124 F.3d at 347). In determining whether a defendant carries his burden, "an inquiring court must consider the totality of the circumstances." *Merritt*, 755 F.3d at 9. "The district court must consider several factors in determining whether the burden of persuasion has been met by the defendant, the most significant being whether the plea was voluntary, intelligent

and knowing, within the meaning of Rule 11." *Marrero-Rivera*, 124 F.3d at 347; *accord Caramadre*, 807 F.3d at 366 (stating that "[c]ritical to the plea-withdrawal inquiry is whether the original guilty plea was knowing, intelligent, and voluntary.").

Although the accordance of the defendant's plea with Rule 11 is the most important factor, the court may consider others, including: (1) the plausibility and weight of the reason given for the withdrawal; (2) the timing of the request; (3) whether the defendant is now colorably asserting legal innocence; and (4) whether the original plea was pursuant to a plea agreement. *Caramadre*, 807 F.3d at 366 (quoting *United States v. Aker*, 181 F.3d 167, 170 (1st Cir. 1999)). "If these factors, taken together, tilt in favor of allowing withdrawal, the court must then weigh the prejudice that the government would suffer if the plea were to be vacated." *Caramadre*, 807 F.3d at 366; *accord United States v. Fernández-Santos*, 856 F.3d 10, 15 (1st Cir. 2017).

       b.    <u>The Defendant's Plea Was Voluntary, Intelligent, And Knowing</u>.

In assessing a motion to withdraw a guilty plea, the First Circuit has repeatedly recognized that "the most significant factor" is whether the plea was voluntary, intelligent, and knowing." *Marrero-Rivera*, 124 F.3d at 347 (citing *United States v. Cotal-Crespo*¸ 47 F.3d 1, 3 (1ˢᵗ Cir. 1995)); *see Caramadre*, 807 F.3d at 366 (describing this factor as "[c]ritical to the plea withdrawal inquiry" and "a paramount concern in a plea withdrawal inquiry.").

Here, the defense "does not assert that his plea was not voluntary, intelligent and knowing." Memo, at 4. Instead, the defense concedes that "that at the time of the guilty plea, **Pierce did so because he believed he was in fact guilty**." *Id.*, at 2 (emphasis added). Thus, this critical factor and paramount concern weighs directly against the defendant.

       c.    <u>The Defendant's Reason For Withdrawal Is Implausible And Weak</u>.

The defendant "must demonstrate a plausible reason for the withdrawal of his guilty plea."

*United States v. Isom*, 85 F.3d 831, 837 (1st Cir. 1996).   "[P]lausibility must rest on more than the defendant's second thoughts about some fact or point of law, or about the wisdom of his earlier decision."   *Id.* (quoting *United States v. Parrilla-Tirado*, 22 F.3d 368, 371 (1st Cir. 1994)).

Here, the defendant claims that he "has come to understand that he did not possess the intent to defraud at the time he engaged in conduct that resulted in a fraud," Motion at 1, and appears to ground its motion primarily on the defendant's impromptu response to the court's unexpected inquiry about his guilty plea – statements made as the defendant was poised to be sentenced.   Memo, ¶ 13.   This self-serving claim is implausible, inconsistent with the defendant's prior admissions of guilt, based upon no new evidence, and supported now only by the affirmation of his attorney.

The defendant's current claim is implausible, particularly given the context in which it was made.   At the time of his impromptu remark, the defendant had: (1) pleaded guilty in a thorough Rule 11 hearing pursuant to a plea agreement that contained an agreed-upon detailed statement of facts that demonstrated his culpability; (2) reviewed a PSR that restated these facts and filed no objections to any of them; (3) filed a sentencing memorandum in which he again conceded "the factual basis for his plea of guilty . . . and admit[ted] to having engaged in fraudulent conduct in obtaining loans from Greylock Federal Credit Union," (D.20, at 2); (4) and told the sentencing judge that he had read the PSR, reviewed it with Attorney Levinson, including the section that described the facts, and had no questions about it.   (D.30, at 3).   Indeed, even when given the opportunity to confer privately with his counsel during the sentencing hearing, the defendant requested that the court convert his guilty plea to that part of the conspiracy charge that involved the credit fraud to an *Alford* plea so that he could be sentenced that day.   *Id.*, at 31.

Against this consistent backdrop, the defendant's eleventh-hour reconsideration of his

criminal intent is entirely implausible.   A defendant is normally bound by the representations he makes in open court at the time of his plea because they are "more likely to be reliable than later versions prompted by second thoughts."   *Padilla–Galarza*, 351 F.3d at 598.

Here, the defendant's claim – that only after the sentencing hearing "he has come to understand that he did not possess the intent to defraud at the time he engaged in conduct that resulted in a fraud" – is exactly the kind of unsupported second thought that does not warrant the remedy of permitting plea withdrawal. *See, e.g.*, *Doyle*, 981 F.2d at 595 (stating "appellant's professed reason for moving to withdraw his plea smacks of post-hoc rationalization.")

Moreover, the defendant offers no new evidence to justify his claim of evidence.   The First Circuit has repeatedly affirmed a district court's refusal "to give weight to a self-serving, unsupported claim of innocence raised judicially for the first time after the Rule 11 hearing." *Isom*, 85 F.3d at 837 (finding that the defendant's unsupported "eleventh-hour profession of innocence lacks merit, and thus does not rise to the level of a "fair and just reason" for withdrawal of his claim."); *Ramos*, 810 F.2d at 313 (finding the defendant's claim of innocence lacked merit where he did not assert innocence at the change of plea hearing, but only at the sentencing hearing).

The court should credit the defendant's voluntary, intelligent, and knowing admission of guilt to both aspects of the conspiracy count in his Rule 11 hearing rather than his eleventh-hour claim of innocence.   As the Supreme Court recognized, "[s]olemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."   *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

           d.      <u>The Defendant's Claim Of Legal Innocence Is Baseless</u>

In the First Circuit, it is well-settled that:

> A "mere protestation of legal innocence cannot in and of itself be issue-determinative, for '[t]here are few if any criminal cases where the defendant cannot devise some theory or story which, if believed by a jury, would result in his acquittal.'" *United States v. Kobrosky*, 711 F.2d 449, 455 (1st Cir. 1983) (citation omitted).   "Merely voicing a claim of innocence has no weight in the plea-withdrawal calculus; to be given weight, the claim must be credible." *United States v. Gates*, 709 F.3d 58, 69 (1st Cir. 2013).   A defendant must put forward "factual contentions" that create a "'legally cognizable defense' to the charges, [otherwise] 'he has not effectively denied his culpability,'" and the district court may deny the motion to withdraw.   *Ramos*, 810 F.2d at 312 (citation omitted).

*Fernández-Santos*, 856 F.3d at 19; *see United States v. Clark*, 931 F.2d 292, 295 (5th Cir. 1991) (stating "mere assertion of innocence, absent a substantial supporting record[,] will not be sufficient to overturn a denial of a motion to withdraw."); *United States v. Ludwig*, 972 F.3d 948, 951 (8th Cir. 1992) (same); *United States v. Turner*, 898 F.2d 705, 713, 472 Fed. Appx. 575, 576 (9th Cir. 1990) (stating "[s]uch unsupported claims do not rise to the level of a fair and just reason for withdrawal of a plea."); *United States v. Torres¸*129 F.3d 710, 715 (2d Cir. 1997) (stating "[a] defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.").

Here, the defendant does not advance any newly discovered facts or dispute the factual basis underlying his plea.   Indeed, the defendant repeatedly agreed with the Government's facts: (1) in the plea agreement, (2) at the Rule 11 hearing in response to numerous questions from the court, (3) in his sentencing memorandum, and (4) even at the start of the sentencing hearing.   "In this instance, the defendant's claim of innocence was not credible; it contradicted the change-of-plea colloquy in which he acknowledged that he committed the charged offenses." *Gates*, 709 F.3d at 69.

The defendant's motion, at bottom, contends that the defendant has now changed his mind about his state of mind, and this baseless assertion should be rejected. *See United States v.*

*Pellerito*, 878 F.2d 1535, 1543 (1st Cir. 1989) (stating "[w]hen an accused seeks to withdraw a guilty plea, the court is not obliged to treat self-serving accounts as gospel."); *Sanchez-Berreto*, 93 F.3d at 24 (rejecting "belated claims of innocence" where defendants "freely admitted their guilt during the flawless Rule 11 hearings" and the subsequent record "evinces only weak and implausible assertions of innocence.")

Similarly, the defendant does not cite any caselaw undermining the defendant's conspiracy with Dicenzo to violate Section 1006.[4]   To prove conspiracy under 18 U.S.C. § 371, the Government must establish: (1) the existence of an agreement with an unlawful object; (2) the defendant's knowing participation in the conspiracy; and (3) an overt act in furtherance of that agreement.   *United States v. Serunjogi*, 767 F.3d 132, 139 (1st Cir. 2014).

To prove a violation under 18 U.S.C. § 1006, the Government must demonstrate "'(1) the defendant's connection with a protected institution; (2) the direct or indirect receipt of some benefit from a bank transaction; and (3) intent to defraud.'"   *United States v. Colon-Munoz*, 192 F.3d 210, 224 (1st Cir. 1999) (quoting *United States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir. 1993)).

In *Colon-Munoz*, the First Circuit explained that the intent to defraud element depends upon the loan officer's conflict of interest:

> In *Brechtel*, the court explained that "a fiduciary who benefits ... by knowingly subordinating the institution's interests to his own in a transaction for which he has responsibility acts with the 'intent to defraud' required by § 1006." *Id.* at 1116. The government can demonstrate an intent to defraud through circumstantial evidence. *See id.* "**An inference of intent to defraud arises where a responsible bank insider acts to procure a transaction which he knows will benefit him, without disclosing his interest therein**.

---

[4] Title 18, United States Code, Section 1006 penalizes a credit union officer who "with intent to defraud any . . . institution . . .   referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such . . . institution."   18 U.S.C. § 1006.

*Id.* (emphasis added).

Here, the defendant does <u>not</u> dispute that: Dicenzo was a GFCU officer; Dicenzo authorized loans for the defendant and his businesses; Dicenzo violated GFCU's policies by authorizing the loans; he paid Dicenzo "money, profit, property or benefits" derived from his GFCU loans, including by writing checks comprising loan funds to Dicenzo's front company (CAD); Dicenzo did not disclose the defendants' payments to GFCU; and defendant lied about the CAD payments when questioned by GFCU investigators.

Rather, the defendant only contests the third element of Section 1006 – he seeks to withdraw his plea because he *now* believes he did not intend to defraud GFCU.  Notably, the defense fails to explain how the defendant could engage in all of this misconduct *without* intending to defraud GFCU.   Instead, the defense motion simply asserts that the defendant now believes he lacked the intent to defraud, apparently because he thought at some point that that the loans were properly issued to him.

This argument is misplaced, because the defendant's fraud inhered from his knowing payments of loan proceeds to Dicenzo, regardless of whether the defendant knew Dicenzo authorized the loans consistent with GFCU policy.   Consistent with the First Circuit's reasoning in *Colon-Munoz*, other Circuits have recognized that the intent to defraud is grounded on the loan officer's undisclosed receipt of the loan proceeds:

> The fraud commences with the deceit — ostensibly acting solely for the interest of the principal while all the while the faithless servant knows he, too, has a pecuniary interest which will or might subvert his undivided loyalty. When there is the purpose to deceive, it matters not whether the objective is to obtain an advantage or to cause the principal to suffer a loss.  Either in effect completed the fraudulent purpose."

*Beaudine v. United States*, 368 F.2d 417, 420 (5th Cir. 1966) (stating that Section 1006

acknowledges "the principal so well grounded in morality and equity that the servant cannot serve two masters and that when this is done without complete disclosure, the law considers that the master-principal's interests either will, or are apt to, suffer."); *United Sates v. Hykel*, 461 F2d 721, 724-25 (3rd Cir. 1972) (finding sufficient evidence of intent to defraud where the loan officer received an interest in a mortgage loan to other borrowers, did not disclose that interest, and took steps to conceal it); *United States v. Chenaur,* 552 F.2d 294, 299-300 (9th Cir. 1977) (affirming Section 1006 conviction of defendant for aiding and abetting bank officers who acted with intent to defraud their institution by accepting side payments from defendant).

Here, it remains undisputed that the defendant paid Dicenzo with money, including checks to Dicenzo's front company, CAD; that the defendant derived these payments directly from loans that Dicenzo authorized; that these payments were not disclosed until credit union auditors investigated the loans; and that the defendant agreed to, and did, provide a false cover story for the CAD payments.

Paragraph 16(a) of the Information sets forth two objects of the conspiracy to violate Section 1006: "**The objects of the conspiracy were to:   a. defraud GFCU** by obtaining various loans and loan modifications for Pierce and his companies in violation of GFCU's loan approval, loan aggregation, loan modification, and loan documentation policies, and **by providing Dicenzo with various money, profit, property, and benefits, including check payments to CAD from Pierce's companies that derived from GFCU's loan funds."** (D.2., ¶ 16(a)).

The defendant spoke only briefly during the aborted sentencing hearing, but he did appear to address, in a somewhat confusing manner, the first object of the Section 1006 conspiracy:

> The reason I plead guilty, your Honor, was when it was explained, when [the prosecutor] explained it, that I got loans I shouldn't have, that's true.   I guess I got loans I shouldn't have.   It didn't feel like I shouldn't have gotten them in the beginning, but after ten years or

23

> nine years, I understood now that the way they were done was
> wrong, and that's why I pled guilty. [] **But the way it felt to me was
> that when I got the loans, they didn't feel at that time that they
> were illegally done, but now I understand that they were.**

D.28, at 16-17.   Even assuming, *arguendo*, that the defendant's statement should be construed as

contradicting the first object and that this statement should be credited instead of his sworn and

detailed Rule 11 admissions, the defendant has failed to contradict the second object, which is the

gravamen of the Section 1006 offense:   the defendant's undisclosed payments of loan proceeds to

the loan officer, which the defendant sought to conceal by lying about the CAD checks.

Indeed, defense counsel admitted that it was the defendant's misuse of the loan proceeds,

including the payments to Dicenzo, which motivated his plea:

> I think that the part of the fraud on the bank charge that most
> compelled Mr. Pierce to believe that he was guilty at the time is that
> **he did know he was obtaining construction loans and business
> loans and the like, and he did know that he was using the
> proceeds of one loan, of a construction loan, to pay the interest
> on another loan.   He knew that that was wrong.   He also knew
> it was wrong to use the proceeds of the construction loan to loan
> Mr. Dicenzo $30,000 for his daughter's wedding. Clearly at the
> time he knew that those things were wrong.**

*Id.* at 29-30.

Under *Colon-Munoz, Chenaur*, *Beaudine*, and *Hykel*, the defendant's intent to defraud is

directly evidenced by his use of the loan proceeds to pay Dicenzo and his attempts to conceal their

purpose.   Because the defendant has failed to advance any factual contentions that create a legally

cognizable defense, the motion should be denied.   *Fernández-Santos*, 856 F.3d at 19.

e.   The Defendant's Motion Is Highly Untimely

The First Circuit has "repeatedly noted that the more a request is delayed - even if made

before sentence is imposed - the more we will regard it with disfavor."   *United States v. Isom*, 85

F.3d 831, 838 (1st Cir. 1996) (citing *United States v. González-Vázquez*, 34 F.3d 19, 23 (1st

24

Cir.1994); *Parrilla-Tirado*, 22 F.3d at 373).  "The rule of thumb is that the longer a defendant waits before moving to withdraw his plea, the more potency his motion must have in order to gain favorable consideration."  *Id.* (quotation omitted).

Accordingly, the First Circuit has unfavorably viewed motions to withdraw a plea made after intervals of seven months, six months, three weeks, and even thirteen days, *Ramos*, 810 F.2d at 313."  *Id.* at 838-839 (stating that appellant's "two-month delay in making his request falls well within this range").

Here, more than nine months elapsed between the defendant's Rule 11 hearing and his motion to withdraw his guilty plea.  During this lengthy interim, the defendant had received the PSR and its statement of facts, reviewed it with his attorney, filed no objections, submitted a sentencing memo that conceded the facts and admitted his guilt, and appeared for his sentencing, during which he requested to move forward by converting part of his plea under *Alford*.  This enormous delay, during which the defendant forged ahead toward sentencing, fatally undermines his claim.  *See Doyle*, 981 F.2d at (stating that "the seven-month period preceding the motion to withdraw - an interval wholly unexplained by plausible inferences consistent with appellant's proffered reason for wanting to scrap his plea - serves to cripple any notion that the plea was coerced.").

f.    Prejudice To The Government

Assuming, *arguendo,* that the factors identified by the First Circuit weighed in favor of the plea withdrawal, the Court should reject the Motion because permitting withdrawal would substantially prejudice the Government.  *See, e.g., Fernández-Santos*, 856 F.3d at 15.

The Government began its plea negotiations with Attorney Levinson's predecessor on or before March 30, 2015, and resumed those plea negotiations after Attorney Levinson began her

representation.   The defendant pleaded guilty nearly a year ago, on June 28, 2018, to crimes committed between 2005 and 2010.   If the defendant were permitted to withdraw his plea now, his case likely would not be tried until sometime in 2020.   *See* U.S. Courts Federal Management Statistics Report (March 2018) (listing median durations exceeding one year for criminal felony trials in Massachusetts for most years dating back to 2013).[5]

Before even reaching trial preparation, the Government would need to present the case to the Grand Jury for an indictment, produce automatic discovery (not produced here because the defendant pled guilty pre-indictment), and respond to any additional discovery requests. In addition, the defendant may wish to file motions to suppress evidence or dispositive motions under Fed. R. Crim. P. 12, to which the Government would also need to respond. At trial, the Government's case could be prejudiced by the pretrial delay, which may have eroded witnesses' memories, and by the likelihood that some of the witnesses against the defendant may be unavailable.

In addition, the Government might be prejudiced at trial by the restricted ability to bring additional charges against the defendant now that so much time has passed since he committed his crimes.   In a typical, contested prosecution, the Government might include a variety of substantive counts to protect against the possibility of dismissal on technical grounds and to increase the likelihood of conviction at trial.   Those protections were unnecessary when the defendant's case was initially charged by Information because he had agreed to plead guilty.

4.     Conclusion

"It is the policy of the law to hold litigants to their assurances."   *Parrilla-Tirado*, 22 F.3d

---

[5]     *See* http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2018.pdf.

at 373.  "Given reasons for withdrawal that are lacking in plausibility, an extended time lapse between the original plea and the motion to withdraw, the absence of any [colorable] assertion of innocence, the district court's scrupulous adherence to the dictates of Rule 11, and the totality of the attendant circumstances," *id.*, this court should decline the defendant's request to withdraw his guilty plea.   Because all of the factors considered by the First Circuit weigh against the defendant, the Motion should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Steven H. Breslow*
        STEVEN H. BRESLOW
        (NY2915247)
        Assistant U.S. Attorney
        300 State Street, Suite 230
        Springfield, MA 01105
        413-785-0330
        steve.breslow@usdoj.gov

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:     */s/ Steven H. Breslow*
        STEVEN H. BRESLOW
        Assistant U.S. Attorney

Dated:   May 10, 2019

27